# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

PHYSICIANS FOR SOCIAL RESPONSIBILITY   )
1111 14th Street, Suite 700   )
Washington, DC 20005   )
   )
PSR COLORADO   )
3213 Nelson Lane   )
Fort Collins, CO 80232   )
   )
ROCKY MOUNTAIN PEACE & JUSTICE   )
CENTER   )
3970 Broadway, Ste. B5   )
Boulder, CO 80304   )
   )
ENVIRONMENTAL INFORMATION   )
NETWORK (EIN) INC.   )
1218 S. Brentwood Street   )
Lakewood, CO 80232   )
   )
ROCKY FLATS DOWNWINDERS   )
380 Windmill Canyon Road   )
Walsenburg, CO 81089   )
   )
CANDELAS GLOWS/ROCKY FLATS   )
GLOWS ROCKY FLATS   )
8752 S. Wenatchee Ct.   )
Aurora, CO 80016   )
   )
ROCKY FLATS PUBLIC HEALTH   )
ADVOCATES   )
10461 W. Indore Drive   )
Littleton, CO 80127   )
   )
        *Plaintiffs,*   )
   )
   v.   )        Civ No.
   )
PETE BUTTIGIEG, in his official capacity   )
as Secretary of Transportation   )
1200 New Jersey Avenue, SE   )
Washington, DC 20590   )
   )
U.S. DEPARTMENT OF TRANSPORTATION   )
1200 New Jersey Avenue, SE   )
Washington, DC 20590   )

|  | ) |
| --- | --- |
| UNITED STATES FEDERAL HIGHWAY ADMININISTRATION 1200 New Jersey Avenue, SE Washington, DC 20590 | ) ) ) ) |
|  | ) |
| and | ) |
|  | ) |
| DEB HAALAND, in her official capacity as Secretary of the Interior 1849 C Street NW Washington, DC 20240 | ) ) ) ) |
|  | ) |
| U.S. DEPARTMENT OF THE INTERIOR 1849 C Street NW, Room 3331 Washington, DC 20240 | ) ) ) |
|  | ) |
| UNITED STATES FISH AND WILDLIFE SERVICE 1849 C Street NW, Room 3331 Washington, DC 20240 | ) ) ) ) |
|  | ) |
| *Defendants.* | ) |

**COMPLAINT FOR DECLARATORY AND INJUNCTION RELIEF**

**INTRODUCTION**

1.     This case has national implications of exceptional importance to health, safety, and environmental protection, in connection with the only federally owned facility ever raided by other federal agencies (the FBI and Environmental Protection Agency), ultimately resulting in federal criminal convictions. Although this facility is no longer in operation, the radioactive contaminants, particularly weapons grade plutonium, that persist in the local ecosystem threaten grave harm to those who live, work, or recreate in or near these areas. In the absence of intervention by this Court, the health and safety of many individuals will be at risk due to exposure from nuclear contaminants that are far above regulatory limits for radiation and appear to be migrating by air and soil.

2.     In particular, this case challenges authorizations by the Federal Highway Administration ("FHWA") and the U.S. Fish and Wildlife Service ("FWS") to construct an 8-mile trail through the most heavily plutonium contaminated portion of the Rocky Flats National Wildlife Refuge (the "Refuge"), and to construct a bridge and underpass connecting the Refuge to hiking, biking, and equestrian trails on neighboring municipalities' lands (collectively the "Greenway" or "Greenway Project").

3.     In authorizing the Greenway Project, the FWS in 2020 issued an Environmental Assessment ("EA") and Finding of No Significant Impact ("FONSI") pursuant to the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4347, finding that the Project would not result in any significant environmental effects. In 2023, the FHWA adopted the FWS's 2020 EA in its entirety without any further NEPA review, and FHWA also issued its own FONSI. By issuing their respective FONSIs, each agency made a final decision not to prepare an Environmental Impact Statement ("EIS") for the Project.

4.     The FWS's 2020 EA—which served as the exclusive means of NEPA compliance for both agencies—is fatally flawed. To begin, it failed to analyze *any* alternatives to the proposed action (other than the "no action" alternative) even though Defendants had previously outlined other trail configurations in 2016, including one option that would avoid the Refuge's most heavily contaminated Wind Blown Area—where the previous Refuge Manager wanted no public trails due to the existence of a "plutonium plume"—and one option that would circumvent the Refuge entirely, the latter of which had been urged for consideration by one of the connecting municipalities (i.e., the City of Boulder).

5.     In addition, although the FWS's EA found that all soil samples in the area were "well within regulatory limits for radiation"—which served as the basis for the FWS's conclusion that the Project will not result in significant impact on the environment—a plutonium

sample *five times higher than the regulatory limit* had been identified less than a year earlier, causing the other connecting municipality (i.e., the City of Broomfield) to withdraw from the Greenway Project entirely.

6.      Finally, the FWS's EA failed to analyze the controversial nature of configuring the Greenway directly through the Refuge's Wind Blown Area when the neighboring municipalities (Boulder and Broomfield) raised significant concerns: Broomfield pulled out of the Greenway Project forcing the FHWA to reroute the Greenway connection through Westminster, while Boulder requested that a configuration avoiding the Refuge be studied.

7.      Together, these events paint a picture of a project in disarray with Defendants connecting the Greenway at the 11th hour to a new municipality that the previous Refuge Manager feared would cause the Greenway to traverse the most contaminated portion of the Refuge. As currently configured, the Greenway connects from Westminster open space, the exact crossing the previous Refuge Manger wished to avoid due to a "plutonium plume."[1]

7.      Despite these significant environmental, health, and safety concerns (including the recent discovery of the highly radioactive plutonium "hot spot" in the transportation corridor), the FWS's 2020 EA does not address these important issues nor does it consider other, less dangerous and controversial locations other than the preferred alternative. Likewise, the FWS's and the FHWA's respective FONSIs—and their concomitant decisions not to prepare an EIS—are not based on a full consideration of the relevant factors and also fail to take into account important issues that demonstrate the highly significant nature of the Project.

_____

[1] Email from S. Berendzen, FWS Refuge Manager to B. Boyle and S. Oliveira, FWS (11/17/11) (having trail underpass "cross from Westminster open space … would put it into the vicinity of the plutonium plume . . . . I would like your feedback confirming that we want to propose an underpass, and your agreement that we prefer it crossing the toll road further north beyond the plutonium plume.").

Accordingly, the FWS's 2020 EA and the agencies' respective FONSIs fail to consider and analyze relevant information, and all of these decisions and analyses violate NEPA, the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2), and are arbitrary, capricious, and not in accordance with law.

8.      Because the FWS's 2020 EA and the agencies' respective FONSIs violate NEPA and the APA in various ways, the Court "shall . . . hold unlawful and set aside" the EA and FONSIs as "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or as issued "without observance of procedure required by law." 5 U.S.C. § 706(2).

## JURISDICTION AND VENUE

9.      This Court has jurisdiction under 28 U.S.C. § 1331 (federal question); 5 U.S.C. §§ 701-706 (APA), because (1) the action arises under the laws of the United States, (2) certain individual respondents are sued in their official capacity; and (3) there is a present and actual controversy between the parties; 28 U.S.C. §§ 2201, 2202 (power to issue declaratory or injunctive relief in cases of actual controversy); and the Equal Access to Justice Act, 28 U.S.C. § 2412.

10.     Venue is proper pursuant to 28 U.S.C. § 1391(e)(3) because the lead Plaintiff resides in this judicial district. Venue is also appropriate under 28 U.S.C. § 1391(e)(1) because the U.S. Department of Transportation, U.S. Department of the Interior, FWS and FHWA all have their respective national headquarters in this district.

## PARTIES

11.     Plaintiff Physicians for Social Responsibility ("PSR") is a national nonprofit, based in Washington, D.C., with state and local chapters and individual members across the country. Guided by the values and expertise of medicine and public health, PSR works to protect

human life from the gravest threats to health and survival, including nuclear weapons—their use, production, testing, and waste storage.

12.     Plaintiff PSR COLORADO ("PSR Colorado") is a Colorado nonprofit corporation. It is the Colorado chapter of Physicians for Social Responsibility. PSR Colorado's goal is to empower health professionals and community members to be credible and effective advocates for the planet and people. Through educational outreach, PSR Colorado keeps health professionals and the community aware of the most current and reliable information on the health impacts of radionuclides and toxins on vulnerable populations.

13.     Plaintiff ROCKY MOUNTAIN PEACE & JUSTICE CENTER ("RMP&JC") is a non-profit organization based in Boulder, Colorado. RMP&JC was founded in 1983 and has more than 1,000 members. It organized events at Rocky Flats, including a near encirclement of the site in 1983, with thousands of citizens protesting the facility. RMP&JC and its members are dedicated to publicizing the continued dangers associated with Rocky Flats contaminants and ensuring that contaminants in the soil at Rocky Flats, including plutonium, beryllium, and uranium, do not become a source of harm to the public on the Rocky Flats site and the surrounding communities.

14.     Plaintiff ENVIRONMENTAL INFORMATION NETWORK (EIN) INC. ("EIN") was formed as an educational organization to disseminate technical information to lay persons to help them understand the issues associated with radiotoxic and hazardous waste issues in the region, especially regarding contamination from the Rocky Flats Nuclear Weapons Facility. EIN has worked for more than 30 years researching information and preparing briefings about Rocky Flats to help individuals make educated decisions regarding hazards they may be exposed to, and their health effects.

15.     Plaintiff ROCKY FLATS DOWNWINDERS ("RFD") is a 501(C)(3) non-profit organization founded in 2014. RFD works to raise awareness of the former Rocky Flats nuclear weapons plant to educate the community, sensitize medical professionals regarding potential adverse health effects suffered by Downwinders, and to offer services for Downwinders suffering health problems that have been correlated with radiation and chemical exposures. In 2016, RFD partnered with Metropolitan State University to present initial findings of a first ever health survey of former and current residents. The health survey was revised in 2022 to include data reported by downwinders through RFD's community-based on-line health survey (www.rockyflatsdownwinders.com). Currently, RFD is focused on securing factual, accessible signage to inform residents and visitors to the Rocky Flats Refuge of the history of the Rocky Flats plant and memorializing the former weapons plan workers.

16.     Plaintiff CANDELAS GLOWS/ROCKY FLATS GLOWS is committed to raising awareness in the local community and beyond about Rocky Flats' nuclear history and the ongoing issues concerning the Superfund site and surrounding area. After forming in 2013 to speak out against housing developments being built adjacent to the contaminated land at Rocky Flats, the community group has been influential in keeping the memory of Rocky Flats alive and helping the community stay up to date with ongoing public safety and development issues. Candelas Glows/Rocky Flats Glows is committed to educating the community, honoring the stories of former Rocky Flats workers and community members new and old through presentations, community meetings and events, media, and collaborations.

17.     Plaintiff ROCKY FLATS PUBLIC HEALTH ADVOCATES works for the protection of public health from contaminants emanating from the former Rocky Flats nuclear weapons plant.  Its principal engages with elected officials of local governments surrounding the site to educate them on remaining contamination and public health risks and to lobby them to not

7

exacerbate the problem by approving or sponsoring dangerous development projects.  Rocky Flats Public Health Advocates is a voice for the public visiting the Rocky Flats National Wildlife Refuge or living or visiting locations downwind of the Refuge.

18.     Many members of the Plaintiff groups live in communities located just downwind of the Refuge. Some of Plaintiffs' members are concerned that construction of the Greenway on the Refuge, through an area the federal government acknowledges is the most heavily contaminated and the site of a "plutonium plume," will cause plutonium to be dislodged and then migrate through the air and to their homes, where it will harm them physically through illnesses related to exposure to these contaminants. Indeed, ten studies from 1970 through 2013 have found offsite plutonium contamination from Rocky Flats at levels representing up to hundreds of times background radiation from atmospheric weapons testing. Another four studies demonstrate elevated cancer rates in the population living downwind of Rocky Flats.

19.     The U.S. Court of Appeals for the Tenth Circuit recently found that one of the Plaintiff groups, RMP&JC, had shown "a concrete interest in [the] increased exposure" associated with constructing trails, through its member Jon Lipsky,that would allegedly "cause an increased risk of radioactive dust exposure." *Rocky Mountain Peace & Justice Ctr. v. U.S. Fish & Wildlife Serv*., 40 F.4th 1133, 1153 (10th Cir. 2022). Mr. Lipsky had testified that he monitors activity from the perimeter of the Refuge on behalf of RMP&JC and circles the outer perimeter of the Refuge monthly. *Id.* The Tenth Circuit also found that RMP&JC's NEPA injury was fairly traceable to the challenged agency action, and that the injury was redressable. *Id.* at 1154. Accordingly, the Tenth Circuit ruled that "the Center has done enough to establish standing to bring its NEPA claims." *Id.*

20.     Plaintiff groups and many of their members are regularly engaged in advocacy and activities related to nuclear issues, generally, and the Rocky Flats Refuge, specifically. They

8

will be harmed by the FWS's and the FWHA's neglect of NEPA procedures when they authorized construction of the Greenway through the Refuge. The only public input allowed was a nominal 14-day comment period after the FWS published its EA in July 2020. The agencies' failure to provide a reasonable public comment period in 2020, and none in 2023, diminishes the effectiveness of the Plaintiff organizations in informing the agencies' decisions and ensuring that all impacts and alternatives are adequately studied in the manner prescribed by NEPA and its regulations.

21.     Additionally, Defendants' actions deny Plaintiffs and their members their right to have the nation's environmental protection laws implemented and enforced, and the satisfaction and peace of mind associated with witnessing their enforcement in order to avoid ecological, health, and other harms in the communities in which Plaintiffs' members reside. These injuries are actual and concrete and would be redressed by the relief sought herein.

22.     Defendant PETE BUTTIGIEG, is being sued in his official capacity as the Secretary of Transportation. In that capacity, he is responsible for ensuring executive agency actions, including those of the FHWA, comply with NEPA and the APA.

23.     Defendant U.S. DEPARTMENT OF TRANSPORTATION is responsible for, and has oversight over, decisions of its agencies, including FHWA.

24.     Defendant FHWA provides oversight and construction of transportation routes and is a primary project participant in the Greenway Project. It is responsible for ensuring its actions comply with the NEPA and the APA.

25.     Respondent DEB HAALAND is being sued in her official capacity as Secretary of the Interior. In that capacity, she is responsible for ensuring executive agency actions comply with NEPA and the APA.

26.     Defendant U.S. DEPARTMENT OF THE INTERIOR is responsible for, and has oversight over, decisions of its agencies, including FWS.

27.     Defendant FWS is an agency within the U.S. Department of the Interior that is charged with the management of the National Wildlife Refuge System, including the Refuge. The Refuge was transferred to the FWS in 2007 by the U.S. Department of Energy. *WildEarth Guardians v. U.S. Fish & Wildlife Serv.*, 784 F.3d 677, 681 (10th Cir. 2015). The U.S. Department of Interior, the parent agency of the FWS, has "administrative jurisdiction over all Refuge land. . . . " *Town of Superior v. U.S. Fish & Wildlife Serv.*, 913 F. Supp. 2d 1087, 1105 (2012), *aff'd*, *WildEarth Guardians,* 784 F.3d 677.

## LEGAL AND REGULATORY FRAMEWORK

### I.     The National Environmental Policy Act ("NEPA")

28.     Congress enacted NEPA in 1969 to "encourage productive and enjoyable harmony between man and his environment" and to promote government efforts "which will prevent or eliminate damage to the environment." 42 U.S.C. § 4321.

29.     NEPA is intended "to ensure Federal agencies consider the environmental impacts of their actions in the decision-making process" and it "establishes the national environmental policy of the Federal Government to use all practicable means and measures to foster and promote the general welfare, create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans." 40 C.F.R. § 1500.1(a).

30.     The Council on Environmental Quality ("CEQ")—an agency within the Executive Office of the President—has promulgated regulations implementing NEPA, *see* 40 C.F.R. §§ 1500-1508, which are "binding on all federal agencies" to effectuate this purpose. *Id.* § 1500.3(a). NEPA regulations are "intended to ensure that relevant environmental information is

identified and considered early in the process in order to ensure informed decision making by Federal agencies." *Id.* § 1500.1(b).

31.     To this end, NEPA requires federal agencies to prepare a "detailed statement"—known as an EIS—for all "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). An EIS must describe (1) "the reasonably foreseeable environmental effects of the proposed agency action," (2) "any reasonably foreseeable adverse environmental effects which cannot be avoided," and (3) "a reasonable range of alternatives to the proposed action." *Id.* § 4332(C)(i)-(iii). The purpose of the EIS "is to ensure agencies consider the environmental impacts of their actions in decision making. It shall provide full and fair discussion of significant environmental impacts and shall inform decision makers and the public of reasonable alternatives that would avoid or minimize adverse impacts or enhance the quality of the human environment." 40 C.F.R. § 1502.1. NEPA further provides that agencies "shall . . . study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(H). 22.

32.     The EIS must "specify the underlying purpose and need to which the agency is responding in proposing the alternatives." 40 C.F.R. § 1502.13. The alternatives analysis, described by CEQ as the "heart of the NEPA process," CEQ, Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations ("Forty Questions"), 46 Fed. Reg. 18,026, 18,026 (Mar. 23, 1981), must then "present the environmental impacts of the proposed action and the alternatives in comparative form based on the information and analysis presented in the sections on the affected environment (§ 1502.15) and the environmental consequences (§ 1502.16)." 40 C.F.R. § 1502.14. Each alternative should be "considered in

detail, including the proposed action, so that reviewers may evaluate their comparative merits." *Id.*

33.     Agencies are directed to consider a broad range of environmental effects including "ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health" impacts and must address them in the EIS "whether direct, indirect, or cumulative." 40 C.F.R. § 1508.1(g)(4).

34.     Direct effects are those "caused by the action and occur at the same time and place," while indirect effects are "caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." *Id.* § 1508.1(g)(1), (2). Cumulative impacts are those that result from the "incremental effects of the action when added to the effects of other past, present, and reasonably foreseeable future actions," regardless of whether undertaken by other federal agencies or private third parties. *Id.* § 1508.1(g)(3). "Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." *Id.*

35.     Where an agency is uncertain as to whether an EIS is required, the agency may prepare an EA that provides "sufficient evidence and analysis for determining whether" the action's effects will have a significant environmental impact. 40 C.F.R. § 1501.5(c). If the effects are expected to be significant, the agency must prepare an EIS, *id.*; if not, it must prepare a FONSI that explains the reasons why the action "will not have a significant effect on the human environment," *id.* § 1508.1(l). Like an EIS, an EA must also identify the purpose and need for the proposed action, any alternatives thereto, and "the environmental impacts of the proposed action and alternatives," *id.* § 1501.5(c).

36.     Public participation is a cornerstone of the NEPA process because such participation ensures that officials "have considered [the] relevant environmental information, and the public has been informed regarding the decision-making process." 40 C.F.R. § 1500.1. As such, CEQ's binding regulations command agencies to "[s]olicit appropriate information from the public" during the NEPA process, and "[p]rovide public notice of NEPA-related hearings, public meetings, and other opportunities for public involvement, and the availability of environmental documents so as to inform those persons and agencies who may be interested or affected by their proposed actions." *Id.* § 1506.6(d), (b); *see also* CEQ, Forty Questions, 46 Fed. Reg. 18,026, 18,037 (Mar. 23, 1981) ("Section 1506.6 requires agencies to involve the public in implementing their NEPA procedures, and this includes public involvement in the preparation of EAs and FONSIs."). "In all cases, the agency shall notify those who have requested notice on an individual action." 40 C.F.R. § 1506.6(b)(1).

37.     The Department of Interior—the parent agency of the FWS—has its own NEPA regulations that supplement (without supplanting) the CEQ's NEPA regulations. *See* 43 C.F.R. part 46. Likewise, the Department of Transportation—the parent agency of the FHWA—has its own NEPA regulations that supplement (without supplanting) the CEQ's NEPA regulations. *See* 23 C.F.R. Part 771.

## II.     The Administrative Procedure Act ("APA")

38.     Under the APA, a reviewing court "shall" set aside agency actions, findings, or conclusions when they are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, or when they are adopted "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D). An agency action is arbitrary and capricious if the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the

evidence before the agency," or if the agency's decision "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfr. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

39.     When reviewing agency action under the APA, the court must ensure that the agency reviewed the relevant data and articulated a satisfactory explanation establishing a "rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43. The agency's failure to do so renders its decision arbitrary and capricious. *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 378 (1989).

## FACTUAL BACKGROUND

40.     The former Rocky Flats nuclear weapons plant ("Rocky Flats Plant") is among the nation's most polluted places. Its name is synonymous with plutonium, a laboratory-developed, radioactive chemical element that was used at the facility to produce nuclear triggers for almost 40 years during the Cold War.[2] After the FBI raided the Rocky Flats Plants—which resulted in federal criminal convictions due to the operators' mismanagement and misconduct—a federal jury in *Cook v. Rockwell* found that plutonium had migrated onto neighboring properties, where it will remain "indefinitely" and cause, on an ongoing basis, an "increased risk of health problems."

41.     In 1951, the U.S. government acquired property located in unincorporated Jefferson County, between Denver and Boulder, Colorado, and developed the Rocky Flats Plant to manufacture nuclear weapon triggers, commonly called plutonium "pits."

---

[2] According to the U.S. Department of Energy ("DOE"), "[p]lutonium can be extremely dangerous, even in tiny quantities, if it is inhaled."  U.S. Department of Energy Office of Environmental Management *Closing the Circle on the Splitting of the Atom*, 19 (1996).

42.     In 1975, the federal government purchased additional lands surrounding the facility to create a buffer zone (the "Buffer Zone"), increasing its size to approximately 6,500 acres. It was owned by the DOE and its predecessors, but contractors operated the Rocky Flats Plant.

43.     "Over the course of almost forty years, manufacturing activities, spills, fires, and waste disposal released plutonium and other radionuclides, […] were dispersed by wind and rain into the soil and water systems in the Buffer Zone."[3]

44.     In 1989, agents of the FBI, led by Jon Lipsky, along with investigators from the Environmental Protection Agency ("EPA"), engaged in the first-ever environmental raid on a federal agency facility based on a two-year investigation into mismanagement and misconduct related to handling of the raw materials, manufacturing processes, and disposal of toxic wastes at the Rocky Flats Plant. The Rocky Flats Plant was shut down, never to reopen.

45.     Also in 1989, the EPA placed the entire Rocky Flats Plant site on the National Priority List ("Superfund") under the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA") due to plutonium and other radionuclide and hazardous substance contamination.

46.     In 1996, the DOE, EPA and the Colorado Department of Public Health and Environment ("CDPHE") entered into the Rocky Flats Cleanup Agreement documenting the remediation plan for the site.

47.     During the three decades between the plant's shutdown and the present, Congress created the Refuge out of lands primarily in the Buffer Zone surrounding the Rocky Flats' highly contaminated central operable unit.

---

[3] *Town of Superior*, 913 F. Supp. 2d at 1099.

## ROCKY FLATS NATIONAL WILDLIFE REFUGE

48.      In 2001, Congress passed the Rocky Flats National Wildlife Refuge Act to create a refuge after remediation of the Rocky Flats Plant.

49.      In 2004, the FWS issued a Comprehensive Conservation Plan/Environmental Impact Statement outlining the plans it had evaluated for managing the Refuge (the "2004 CCP/EIS").

50.      Physical cleanup of the Rocky Flats Plant site was completed in October 2005 at a contract expense of $7.7 billion over the ten-year project.[4] Federal agencies declared this cleanup a success because it cost less than the original estimates of approximately $37 billion and 65 years.[5] Community groups, however, claimed that the remediation was underfunded, too short in duration, and severely inadequate.

51.       In 2006, the DOE, EPA, and CDPHE jointly issued a final cleanup corrective action decision/record of decision ("CAD/ROD"), recommending continued DOE jurisdiction over 1,308 acres that required further cleanup, but finding the surrounding property "acceptable for unrestricted use and unlimited exposure."[6]

52.      The CAD/ROD carved out the central operable unit, retained by DOE for future remediation.[7]

---

[4] DOE, Legacy Management, "CERCLA/RCRA Fact Sheet, Rocky Flats, Colorado Site," p. 2, (2016).
[5] *Id.*
[6] DOE, EPA, & CDPHE, "Corrective Action Decision/Record of Decision for Rocky Flats Plant (USDOE) Peripheral Operable Unit and Central Operable Unit" (2006), p. 3-5.
[7] *Id.* at 15-16.

53.     In 2007, the peripheral operable unit was removed from the Rocky Flats National Priorities List. The POU, comprising the 4,933-acre Refuge, was transferred by DOE to the FWS.

## MIGRATION OF PLUTONIUM

54.     In several cases since the FWS issued its 2004 CCP/EIS, the Tenth Circuit and the District of Colorado have found that plutonium at Rocky Flats has migrated beyond the central operable unit. *WildEarth Guardians*, 784 F.3d at 681 ("As a result of the weapons work, some of the land became polluted by various hazardous materials, including plutonium."); *Town of Superior*, 913 F. Supp. 2d at 1099 ("[O]ver the course of forty years, manufacturing activities, spills, fires, and waste disposal released plutonium and other radionuclides, which were dispersed by wind and rain into the soil and water systems in the buffer zone.").

55.     Such migration is almost certainly linked to the massive amount of plutonium that went missing during the years the Rocky Flats Plant was producing nuclear triggers. *See Cook v. Rockwell Int'l Corp.,* 580 F. Supp. 2d 1071, 1145–46 (D. Colo. 2006) ("It is undisputed that the cumulative MUF [material unaccounted for] during Defendants' operation of Rocky Flats is more than 2,600 pounds.").

56.     In addition to dispersing in and around the Refuge, this migrating plutonium has found its way to neighboring properties. A jury found that plutonium from Rocky Flats' operations had contaminated a wide area of land beyond Rocky Flats' borders, and that such plutonium would "continue to be present" on these neighboring properties "indefinitely." *Cook v. Rockwell International Corporation, etc.*, Civ. 90-cv-181-JLK (Jury Verdict Form, Feb. 14, 2006) at ¶¶ A(1-3) and B(1-3). The jury found the plaintiffs would suffer "increased risk of health problems as a result of this exposure." *Id*. at C(1) and D(1). The jury awarded damages totaling into the hundreds of millions of dollars. *Id*. at pp. 15, 24-27.

57.     Given its location and terrain, the Refuge is particularly susceptible to airborne migration of soil-based contaminants. High winds prevail through most of the Refuge, blowing from the west to the east. In fact, DOE created the 280-acre National Wind Technology Center at Rocky Flats in 1970s to conduct wind research. The National Wind Technology Center is located adjacent to the northwest portion of Rocky Flats, where winds can exceed 100 miles per hour.

## THE GREENWAY PROJECT

58.     On September 15, 2018, a limited trail system within the Refuge was opened to the public. These trails do not directly connect to public lands owned by neighboring municipalities.

59.     The Rocky Mountain Greenway, a collaboration between federal, state, and local governments, is envisioned as a continuous trail or transportation corridor from the Rocky Mountain Arsenal to Rocky Mountain National Park.[8]

60.     In July 2016, the FWS and the FHWA produced the Rocky Mountain Greenway Feasibility Study ("Feasibility Study") analyzing data collected during site visits and identifying a range of feasible trail alignments for the Greenway, including those that avoided the Wind Blown Area or circumvented the Refuge entirely. While providing "some insight on sensitive environmental areas," the 2016 Feasibility Study stated that more environmental analysis, including NEPA clearances, "will be needed." The Feasibility Study anticipated that the Greenway would connect to the City and County of Broomfield, rather than Westminster.

61.     In November 2017, the FHWA Central Federal Lands Highway Division published a Scoping Report for Rocky Flats National Wildlife Refuge Trails that depicted the

---

[8] Adkins and PKM Design Group, "America's Great Outdoors, Rocky Mountain Greenway Feasibility Study, Phase 1: Broomfield to Boulder," p. 1 (2016).

Greenway passing through the Refuge, abandoning previously identified routes around the

Refuge's perimeter. This Scoping Report depicted an alignment for the Greenway Trail next to

Indiana Boulevard at the eastern edge of the Refuge, rather than crossing the Wind Blown Area

near DOE's Superfund site.

### THE WIND BLOWN AREA

62.     The Wind Blown Exposure Unit ("Wind Blown Area") contains the highest levels

of plutonium in the Refuge. *(See* Fig. 1.1, below.)

63.     The Wind Blown Area is a pathway for historical open burial locations within the

Central Operable Unit.



64.     A fact sheet summarizing the 2006 CAD/ROD published by CDPHE, DOE and the EPA reported that, while the residual plutonium concentrations in surface soil in the Refuge average about 1.1 picocuries/gram, "[t]he highest concentration of plutonium detected in surface soil samples in the *eastern refuge* was 20.3 picocuries per gram of soil." (emphasis added).

65.     The FWS EA references soil sampling undertaken by an FWS contractor in June 2018 analyzing 48 "soil samples collected along planned trail routes for radionuclides." The contractor stated that the "maximum plutonium activity" detected in 2016, 3.510 pCi/g, was in the Wind Blown Area.[9]

66.     The previous FWS Refuge Manager had proposed keeping the trail underpass "further north beyond the plutonium plume" rather than "cross[ing] from Westminster open space further south."[10]  Due to Broomfield's withdrawal from the Greenway Project in 2020, the preferred alternative now has the Greenway cross into Westminster open space, the exact crossing the previous Refuge Manger wanted to avoid.

67.     However, neither the FWS EA or FONSI, nor the FHWA FONSI addressed the significant issue of directing the Greenway through "the plutonium plume" or considered any alternative thereto.

### THE 2020 EA AND SUBSEQUENT DISOVERY OF THE 264 pCi/g PLUTONIUM PARTICLE ("BILL RAY PARTICLE")

68.     Disturbingly, in August 2019, Bill Ray, the executive director of the Jefferson Parkway Authority, a governmental authority made up of Jefferson County, Arvada, and

---

[9] FWS EA at 4.
[10] Email from S. Berendzen, FWS Refuge Manager to B. Boyle and S. Oliveira, FWS (11/17/11) (having trail underpass "cross from Westminster open space … would put it into the vicinity of the plutonium plume . . . . I would like your feedback confirming that we want to propose an underpass, and your agreement that we prefer it crossing the toll road further north beyond the plutonium plume.").

Broomfield, disclosed that a plutonium particle measuring 264 picoCuries per gram (pCi/g) (the "Bill Ray particle") had been detected in a sample along the eastern edge of the Refuge in the Jefferson Parkway transportation corridor near the now-proposed Greenway route.[11] The Bill Ray particle is *five times higher* than the regulatory limit of 50 pCi/gm soil that serves as the maximum allowable standard for "the acceptable risk range," even though that maximum limit still results in an "increased cancer risk" for both "Refuge workers" and "Refuge visitors." *Rocky Mountain Peace & Justice Ctr.*, 40 F.4th at 1145 (cleanup standard set at 50 pCi/g").

69.     The discovery of the Bill Ray particle caused the City and County of Broomfield to withdraw from the Greenway Project in February 2020, joining the Town of Superior which had rejected the Greenway Project in 2016. Broomfield also withdrew from the Jefferson Parkway Authority at the same time.[12]

70.     Nearly a year after the discovery of the Bill Ray particle, the FWS issued its EA in July 2020. The only public input allowed was a nominal 14-day comment period after the EA was published.

71.     Plaintiff RMP&JC submitted comments during this truncated period, linking them within the document to research undertaken by its expert plutonium chemist, Michael Ketterer, Ph.D. Those comments and Dr. Ketterer's research highlighted serious concerns about the environmental, health, and safety implications of the proposed trail location and identified the Bill Ray particle.

---

[11] https://www.denverpost.com/2019/08/20/rocky-flats-plutonium-jefferson-parkway/

[12] https://www.denverpost.com/2020/02/26/jefferson-parkway-broomfield-withdraws/

72.     The FWS EA considered an Alternative A (no action) and an Alternative B (the preferred alternative). Alternative B entails "constructing 8.2 miles of non-motorized trails within and adjacent to the Refuge, improving off-road connections to existing regional trail systems, minor improvement to the main entrance and parking area, and two additional connections to adjacent open space lands."

73.     Early in the Greenway planning process, maps showed the Greenway circumnavigating Rocky Flats.[13] However, neither of the two alternatives analyzed in the FWS EA considered a non-Rocky Flats configuration for the Greenway Project.

74.     A NEPA analysis that considered a route that circumvented Rocky Flats was deemed critical by the City of Boulder, into whose land the Greenway will connect north of the Refuge. The Boulder City Council passed Resolution 1182, "assert[ing] that the NEPA process shall consider a reasonable range of alternatives. These alternatives shall explore the viability of various routes and crossing locations, *including one option that stays outside of Rocky Flats NWR along the east and north sides*." Boulder City Council Resolution 1182, Response Guidelines (emphasis added).

75.     When Boulder's City Council passed Resolution 1182 in 2016, it expressly refused to endorse a location or design for Boulder's Greenway connection, noting that "[t]he city believes that, at this time, there is not enough information to endorse one location or design for the underpasses or trail connection, prior to the completion of the NEPA process." *Id.*

---

[13] In 2016, USFWS revised the Rocky Flats NWR public trail plans in order to incorporate a Rocky Mountain Greenway section through the Rocky Flats NWR, abandoning the previously planned routes around the refuge's perimeter. *Compare* **Exhibit 2** at 16 (Fig. B. Segment 1 – Around Rocky Flats NWR) *with* Exhibit 4 at 15 (Fig. 7. Segment 1 – Through Rocky Flats).

76.     Without any explanation, neither of the alternatives considered in the EA analyzes a configuration that stays outside the Refuge, as the City of Boulder repeatedly requested.

77.     Nor does the EA consider an action alternative located in the Refuge that would specifically avoid the Wind Blown Area, as the previous Refuge Manager viewed as necessary to avoid the "plutonium plume" located in this highly contaminated portion of the Refuge.

78.     The EA not only failed to consider action alternatives that would circumnavigate the Refuge entirely or at least avoid the Wind Blown Area, but failed even to provide an explanation for refusing to consider these obvious alternatives long urged by participating municipalities and members of the public.

79.     The proposed Greenway Project was expressly excluded from any prior court analysis. *See Rocky Mountain Peace & Justice Ctr.*, 40 F.4th at 1157-58 ("The potential trail modification into the Wind Blown Area is not part of the challenged agency action because the Service excluded it from the 2018 EAS.").

80.     In choosing Alternative B, the FWS acknowledged that there would be soil disturbance, but the agency stated that "EPA has determined that no hazardous contamination (including plutonium) occurs above levels that allow for unlimited use of the area."

81.     The EA concludes its discussion of plutonium risks by citing a CDPHE report that states that "remaining Rocky Flats plutonium in the Jefferson Parkway transportation corridor and offsite poses a small risk, well within regulatory limits for radiation."

82.     Remarkably, the FWS's EA does not mention—let alone analyze as part of the EA's consideration of alternatives and impacts—the major discovery of the Bill Ray particle in 2019. Rather, the EA states merely that there is a "consistent picture" that the "remaining Rocky Flats plutonium *in the Jefferson Parkway transportation corridor* and offsite poses a small risk, well within regulatory limits for radiation." In reality, the discovery of the Bill Ray particle in

2019—which is more than *five times the regulatory limit for acceptable risk*—not only contradicts the EA's conclusion of a "consistent picture," but starkly demonstrates the significant risks and high stakes of this Project for the environment, health, and safety.[14]

### THE FWS FONSI (2020) AND THE FHWA FONSI (2023)

83.    The FWS issued its FONSI in November 2020, while the FHWA issued its FONSI in August 2023. 88 Fed. Reg. 54393 (Aug. 10, 2023) (notice of final agency action).

84.    The FWS FONSI did not consider any action alternatives other than the proposed Alternative B, which it adopted. It failed to consider alternative trail configurations that circumnavigated the Refuge, as Boulder requested, or avoided, to the extent practicable, the Wind Blown Area that the previous FWS Manager had wished to keep off limits.

85.    The FWS FONSI also failed to address the significance of the Bill Ray particle or how its discovery contradicted the EA's key conclusion that "remaining Rocky Flats plutonium in the Jefferson Parkway transportation corridor" was "within regulatory limits," even though the Bill Ray particle exceeds such limits *by a factor of five*. Nor did the FWS FONSI consider the obvious significance of the Bill Ray particle on health, safety, or the environment.

86.    On August 4, 2023, the FHWA issued its FONSI, over three years after the FWS issued its EA in July 2020.

87.    The FHWA FONSI "adopt[ed] the analysis contained in the FWS EA" and "supplemented some of the analysis with additional studies." However, none of the supplemental analyses considered the significance of the Bill Ray particle and whether its discovery

---

[14] RMP&JC identified the Bill Ray particle in its comments on the FWS EA.  FWS's Refuge Manager also received notice of the Bill Ray particle on July 27, 2020 in CDPHE's "Jefferson Parkway Review."

undermined the EA's key conclusion that "remaining Rocky Flats plutonium" was "within regulatory limits."

88.     The FHWA FONSI, like the one issued by FWS, failed to consider any action alternative other than the proposed Project, such as configuring the Greenway to avoid, to the extent practicable, the "plutonium plume" in the Wind Blown Area or circumnavigating the Refuge entirely.

## FIRST CLAIM FOR RELIEF –
## VIOLATIONS OF NEPA AND THE APA

89.     Each and every allegation set forth in this complaint is incorporated herein by reference.

90.     By failing to consider any action alternative other than the proposed action, and by failing to analyze any alternative Greenway route that would avoid the Refuge or the Wind Blown Area to reduce the environmental, health, safety, and other impacts of the action, the FWS's 2020 EA (and the FHWA's adoption of the EA for its own NEPA compliance) violates NEPA, 42 U.S.C. §§ 4321-4347, its implementing regulations, 40 C.F.R. parts 1500-1508, 43 C.F.R. part 46, 23 C.F.R. Part 771, and the APA, 5 U.S.C § 706(2).

91.     By failing in the FWS's EA and both agencies' FONSIs to consider the direct, indirect, and cumulative impacts of the Project including the discovery of the Bill Ray particle in the transportation corridor, Defendants failed to take a "hard look" at the environmental effects of the Greenway Project, in violation of NEPA, 42 U.S.C. §§ 4321-4347, its implementing regulations, 40 C.F.R. parts 1500-1508, 43 C.F.R. part 46, 23 C.F.R. Part 771, and the APA, 5 U.S.C § 706(2).

92.     By failing to prepare an EIS for the Project, despite the Project implicating numerous "significance" NEPA criteria and despite the existence of extraordinary circumstances,

and by failing to base their decisions not to prepare an EIS on all relevant facts, the FWS and the

FHWA acted in violation of NEPA, 42 U.S.C. §§ 4321-4347, its implementing regulations, 40

C.F.R. parts 1500-1508, 43 C.F.R. part 46, 23 C.F.R. Part 771, and the APA, 5 U.S.C § 706(2).

93.     By failing to hold a public hearing on the Project, by failing (upon information

and belief) to publish notice of the 2020 EA in a newspaper of record, and by failing to provide a

30-day comment period on the 2020 EA, the FWS and the FHWA acted in violation of NEPA,

42 U.S.C. §§ 4321-4347, its implementing regulations, 40 C.F.R. parts 1500-1508, 43 C.F.R.

part 46, 23 C.F.R. Part 771, and the APA, 5 U.S.C § 706(2).

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

1.      Declare that Defendants have violated NEPA and the APA;

2.      Declare that the Defendants' actions as set forth in this Complaint are arbitrary,

capricious, an abuse of discretion, or not in accordance with law; or are without observance of

procedures required by law; and therefore must be set aside pursuant to the APA, 5 U.S.C. §

706(2);

3.      Enjoin any future work by Defendants and/or their agents or contractors on the

Greenway Project until Defendants have complied with their obligations under NEPA and

certified to this Court that they have complied with the applicable laws;

4.      Set aside the FWS's EA, the FWS's FONSI, and the FHWA's FONSI for the

Greenway Project because of Defendants' failure to comply with their obligations under NEPA;

5.      Award Plaintiffs their costs and expenses, including reasonable attorneys' fees, as

provided by the Equal Access to Justice Act, 28 U.S.C. § 2412, the ESA 16 U.S.C. § 1540(g)(4)

or other authority; and

6.      Grant Plaintiffs such further declaratory and injunctive relief as may be necessary

and appropriate or as the Court deems just and proper.

Respectfully submitted this 8th day of January, 2024.

By:     */s/ William S. Eubanks II*
        William S. Eubanks II
        EUBANKS & ASSOCIATES, PLLC
        1629 K Street NW, Suite 300
        Washington, DC 20006
        (970) 703-6060
        bill@eubankslegal.com

By:     */s/ Randall M. Weiner*
        Randall M. Weiner
        *PHV application forthcoming*
        Annmarie Cording
        *PHV application forthcoming*
        WEINER & CORDING
        3100 Arapahoe Avenue, Suite 202
        Boulder, CO  80303
        (303) 440-3321
        randall@randallweiner.com

        *Attorneys for Plaintiffs*