## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| PHYSICIANS FOR SOCIAL RESPONSIBIL-ITY et al., | |
| *Plaintiffs*, | |
| v. | Civil Action No. 24-61 (TJK) |
| PETE BUTTIGIEG et al., | |
| *Defendants*. | |

## <u>MEMORANDUM OPINION</u>

The Rocky Flats National Wildlife Refuge in Colorado is located on land surrounding what was once a nuclear weapons production site.  After nuclear production stopped, a multi-billion-dollar and years-long cleanup effort ensued until federal and state agencies certified that the Refuge was safe and "acceptable for unrestricted use and unlimited exposure."  The Refuge was then transferred to the U.S. Fish and Wildlife Service, or FWS, which opened it and a network of internal trails to the public.  FWS then cooperated with the Federal Highway Administration—the FHWA—to authorize a project to improve upon and add to those trails.

Plaintiffs, a group of environmental and public-health advocates, are concerned that radioactive contaminants persist in the local ecosystem, largely because of the discovery, about five years ago, of the colloquially termed "Bill Ray particle"—a soil sample that reflected a plutonium level above the regulatory limit.  In summary, they believe that FWS and FHWA failed to adequately consider the health risks when they authorized the trail development project.  So they sued, alleging that these agencies violated the Administrative Procedure Act and federal environmental law, and moved to preliminarily enjoin them from proceeding with the project.  Because the Court finds that Plaintiffs have failed to show that such extraordinary relief is justified here, it will deny

their motion.

## I.     Background

### A.     Statutory and Regulatory Background

The National Environmental Policy Act, or NEPA, 42 U.S.C. §§ 4321–4347, is the "basic

national charter for protection of the environment," 40 C.F.R. § 1500.1(a).  It seeks to ensure that

federal agencies "adequately assess the environmental impacts of actions they undertake."  *City of*

*Oxford v. FAA*, 428 F.3d 1346, 1352 (11th Cir. 2005).  But it "does not mandate particular results"

to accomplish its environmental goals.  *Robertson v. Methow Valley Citizens Council*, 490 U.S.

332, 350 (1989).  Instead, "NEPA imposes only *procedural* requirements on federal agencies."

*DOT v. Pub. Citizen*, 541 U.S. 752, 756 (2004) (emphasis added).

One of those requirements is that agencies prepare a "detailed statement" for "major federal

actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(C).  That

"detailed statement" is known as an environmental impact statement, or EIS.  *See* 40 C.F.R.

§ 1508.11.[1]  But an EIS is required only for actions that "*significantly* affect[]" the environment.

42 U.S.C. § 4332(C) (emphasis added).  To determine whether an action will have a "significant"

environmental impact, agencies evaluate the "context" and "intensity" of the action.  40 C.F.R.

§ 1508.27.  "[Context] means that the significance of an action must be analyzed in several

---

[1] The Code of Federal Regulations has been amended since the authorizations at issue took place, and the relevant regulatory scheme has been modified.  But throughout their briefing, the parties cite regulations then in force, even if those citations are now outdated.  The Court will follow suit.  *Cf. Panhandle E. Pipe Line Co. v. FERC*, 613 F.2d 1120, 1135 (D.C. Cir. 1979) ("It has become axiomatic that an agency is bound by its own regulations."); *NEDACAP v. EPA*, 752 F.2d 999, 1009 (D.C. Cir. 2014) ("Although it is within the power of an agency to amend or repeal its own regulations, an agency is not free to ignore or violate its regulations while they remain in effect." (cleaned up)); *United States v. Gutierrez*, 443 F. App'x 898, 905 (5th Cir. 2011) ("We cannot allow agencies to flout in-force regulations and then excuse their own non-compliance by adopting new regulations.").

contexts such as society as a whole (human, national), the affected region, the affected interests, and the locality." *Id.* § 1508.27(a).  And "[intensity] refers to the severity of impact," which should be determined by an evaluation of several factors.  *Id.* § 1508.27(b).  Most relevant here, those factors include (1) "[t]he degree to which the proposed action affects public health or safety," (2) "[t]he degree to which the effects on the quality of the human environment are likely to be highly controversial," and (3) "[t]he degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks." *Id.* § 1508.27(b).

Agencies rely on these considerations to prepare an environmental assessment, or EA.  *See* 40 C.F.R. § 1508.9.  This assessment, which precedes the preparation of an EIS, is a "concise" public document that "[b]riefly" discusses the environmental impacts of, and alternatives to, a proposal for federal action.  *Id.*  If the EA results in a finding that the environmental impact of some action would be significant, an EIS must then be prepared.  But if the EA concludes other-wise, then the agency may issue a "finding of no significant impact," or FONSI, and the NEPA process is complete.  *See id.* § 1508.13.

### B.    Factual Background

The Rocky Flats site in Colorado used to be home to a nuclear weapons production facility.  But in the early 1990s, the federal government closed the site and began to clean it up.  ECF No. 8-5 at 8.  In October 2005, after ten years and over $7 billion in expenditures, the cleanup ended.  ECF No. 8-4 at 2.  Those efforts removed 21 tons of nuclear material and over 800 structures, including six plutonium facilities.  *Id.*; *see also* ECF No. 8-5 at 13.

While that cleanup was ongoing, in 2001, Congress passed the Rocky Flats National Wild-life Refuge Act, Pub. L. No. 107–107, 115 Stat. 1012 (2001), which sought to convert the site into the Refuge it is today.  The Act declared that "[t]he national interest requires that . . . cleanup and closure of the entire site be completed safely, effectively, and without unnecessary delay and that

the site thereafter be retained by the United States and managed so as to preserve the value of the site for open space and wildlife habitat." *Id.* § 3172(a)(4).  The Act also declared that the "Rocky Flats site provides habitat for many wildlife species, including a number of threatened and endangered species," and that "[e]stablishing the site as a unit of the National Wildlife Refuge System will promote the preservation and enhancement of those resources for present and future generations." *Id.* § 3172(a)(5).

To prepare the Refuge for that future as part of the National Wildlife Refuge System, FWS completed a Comprehensive Conservation Plan and corresponding EIS in the mid-2000s.  *See* ECF No. 8-17 at 6.  That document analyzed "the impacts of various alternatives to construct any infrastructure to support future public visitation" of the Refuge.  *Id.*  Specifically, it evaluated four alternatives.  *Id.* at 9.  And "[a]fter public review and comment, the FWS ultimately chose" an alternative that provided for wildlife, habitat, and public use.  *Id.*  That alternative, it found, "best satisfie[d] the missions of the FWS and the National Wildlife Refuge System, the direction of the Rocky Flats National Wildlife Refuge Act of 2001, and the long-term needs of the habitats and wildlife at the Rocky Flats."  *Id.*  Consistent with all the above, FWS "anticipated that over the next 15 years visitor use facilities would include 12.8 miles of multi-use trail, 3.8 miles of hiking-only trail, a visitor contact station, interpretive overlooks, viewing blinds, and associated access and parking facilities."  *Id.*

Then, in 2006, three agencies—the U.S. Department of Energy ("DOE"), the U.S. Environmental Protection Agency ("EPA"), and the Colorado Department of Public Health and Environment ("CDPHE")—jointly issued a final cleanup "Corrective Action Decision/Record of

Decision," or "CAD/ROD."[2]  *See* ECF No. 8-5.  These agencies distinguished between two parts of the Rocky Flats site: the "Central Operable Unit" and the "Peripheral Operable Unit."  *Id.* at 1. DOE would retain jurisdiction over the Central OU because it required "institutional and physical controls, incorporating continued monitoring and maintenance."  *Id.* at 3.  But as to the Peripheral OU, the agencies concluded that "no hazardous substances, pollutants, or contaminants occur in [it] above levels that allow for unlimited use and unrestricted exposure."  *Id.* at 5.  The CAD/ROD also found that "[c]onditions in the Peripheral OU are acceptable for unrestricted use and unlimited exposure" because "the risk and dose from low levels of residual radionuclides in the Peripheral OU were well within the EPA's acceptable risk range."[3]  *Id.* at 64–65.  Thus, DOE selected "No Action" as the corrective remedy for the Peripheral OU.  *Id.* at 64.

As a result of all this, EPA certified in 2007 that the cleanup had reached such a point that the Peripheral OU would be removed from the "CERCLA National Priorities List."[4]  *See* National Oil and Hazardous Substances Pollution Contingency Plan; National Priorities List, 72 Fed. Reg. 29,276, 29,276 (May 25, 2007).  That list contains "national priorities among the known releases or threatened releases of hazardous substances, pollutants, or contaminants throughout the United States."  54 Fed. Reg. 41,015, 41,015 (Oct. 4, 1989).  In removing the Peripheral OU from the list, EPA declared that it "poses no significant threat to public health or the environment and, therefore, no further remedial measures pursuant to CERCLA are appropriate."  72 Fed. Reg. at 29,276.

---

[2] DOE took the lead on authoring the CAD/ROD, but "[t]he State of Colorado and EPA concur[red] with [DOE's] selected remedy/corrective action."  ECF No. 8-5 at 2.

[3] "Radionuclides are atoms that emit radiation as they undergo radioactive decay through the emission of alpha particles, beta particles, or gamma rays."  *Rocky Mountain Peace & Just. Ctr. v. FWS*, 40 F.4th 1133, 1145 n.6 (10th Cir. 2022).

[4] "CERCLA" refers to the Comprehensive Environmental Response, Compensation, and Liability Act.  *See* 42 U.S.C. §§ 9601 *et seq.*

Thus, DOE transferred jurisdiction over the Peripheral OU to FWS, which would manage it as the Rocky Flats National Wildlife Refuge.  *See also* ECF No. 8-17 at 6.

In September 2018, FWS opened to the public a network of internal trails in the Refuge. ECF No. 8-17 at 5.  Two years later, FWS issued an EA for the project at issue here, which it called "Improved Visitor Access to the Rocky Flats National Wildlife Refuge."  *See generally id.*  This project "would improve the 8.2 mile non-motorized trail within the refuge also known as the Rocky Mountain Greenway Trail."  *Id.* at 5.  And it "would also include: (1) the creation of improved 'off-road' connections to existing regional trail systems, (2) minor improvements to the refuge's existing main entrance and parking area, and (3) support [for] a partner-led project funded through the Federal Lands Access Program (FLAP) to create two additional connections to adjacent open space lands."  *Id.*

As this extended history of the Refuge lands reflects, FWS's EA for this project came long after DOE, EPA, and CDPHE had already concluded that the lands had "no hazardous substances, pollutants, or contaminants . . . above levels that allow for unlimited use and unrestricted exposure."  ECF No. 8-5 at 5.  Still, FWS's EA discussed additional confirmatory testing it had engaged in to ensure the safety of the project.  ECF No. 8-17 at 8.  Specifically, "[i]n June 2018, the FWS contracted with a company to analyze soil samples collected along planned trail routes for radionuclides."  *Id.*  Forty-eight samples were collected, of which "33 samples (69%) were below background level including 15 reported below detection."  *Id.*  And "[t]he maximum plutonium . . . activity detected was 3.510 pCi/g [picoCuries per gram] within the Wind Blown Exposure Unit, which is one-third the Wildlife Refuge Worker PRG [Preliminary Remediation Goal] of 9.3 pCi/g."  *Id.*  FWS's EA also referenced "[a]dditional sampling . . . completed off-refuge by partners."  *Id.*  Those "[r]esults [were] consistent with past soil sampling efforts."  *Id.* at 23.  For

example, "[a]t the Highway 128 location, all samples were returned below background levels for plutonium." *Id.* And "[a]t the Indiana Street location, one sample contained a plutonium . . . concentration of 19.400 pCi/g," but "[n]o other samples exceeded" the 9.3 pCi/g PRG and "the mean of all samples was 4.406 pCi/g." *Id.*

The PRG of 9.3 pCi/g referenced above is distinct from—and much lower than—the "remedial action level" of 50 pCi/g that the agencies had found acceptable for human exposure purposes. *See Rocky Mountain Peace & Just. Ctr. v. FWS*, 40 F.4th 1133, 1145 (10th Cir. 2022) ("[The agencies] set the cleanup standard for eventual public use of the Refuge at 50 picoCuries per gram."). The agencies had previously determined that "any exposure levels below 50 pCi/g fall within the acceptable risk range." *Id.* At 50 pCi/g, an individual "who worked four hours indoors and four hours outdoors in the [Refuge] for 250 days each year for 18.7 years" "would have an increased cancer risk of around 1 in 133,000." *Id.* at 1145 & n.8.

Then, in August 2019, Bill Ray, the executive director of the Jefferson Parkway Highway Authority (a Colorado public entity), announced that a plutonium particle measuring 264 pCi/g had been detected just outside the eastern perimeter of the Refuge. *See* ECF Nos. 8-13, 8-14. The so-called "Bill Ray particle" was discovered in a single soil sample that yielded disparate results. ECF No. 8-13 at 1. The reading in one portion of the sample was 264 pCi/g, but only 1.5 pCi/g in another portion. *Id.* CDPHE announced that "[t]he 264 pCi/g sample [was] above the 50 pCi/g cleanup standard for Rocky Flats that was set to protect public health with a margin of safety." ECF No. 8-14 at 1. Although CDPHE did "not believe there [was] an immediate public health threat," it explained "that further sampling and analysis [was] needed to assess what this elevated sample may mean for long-term risks, and whether it [was] an isolated instance, or a sign of a wider area of relatively high contamination." *Id.*

CDPHE then conducted that further sampling and analysis.  In June 2020, it released a report detailing its follow-up efforts after the discovery of the Bill Ray particle.  *See* ECF No. 11-1.  To begin, it reminded the public of the state of Rocky Flats:

> While it has long been known small amounts of plutonium from Rocky Flats are present in these areas, and offsite, data and analysis showed these areas met regulatory requirements.  The health risk associated with remaining radionuclides is very small.  The [CDPHE's] Colorado Central Cancer Registry studies have not detected an overall pattern of cancers tied to Rocky Flats.

*Id.* at 2.  The Bill Ray particle was "a single outlier," but CDPHE explained that additional soil sampling served as a useful "double check."  *Id.* at 3.  So, further "step-out sampling" was conducted "in a 20-foot spaced grid pattern, creating a box of 25 sample points around" the location where the Bill Ray particle was discovered.  *Id.* at 5.  All those samples yielded results of less than 3 pCi/g.  *Id.*  Nor was CDPHE the only entity that conducted additional testing.  Indeed, certain plaintiffs in this very case, the environmental nonprofits Rocky Mountain Peace & Justice Center and Rocky Flats Downwinders, performed their own independent tests.  *Id.*  Although they declined to provide details, they reported to CDPHE that their "soil testing results '[were] well below the 50 pCi/g . . . remedial standard.'"  *Id.*

Besides all that, CDPHE used a regulatory dose assessment tool "to perform an assessment of the potential radiation dose from plutonium for a construction worker and a nearby resident."  ECF No. 11-1 at 5.  That tool found that "[t]he calculated potential doses, even in the most extremely conservative worst case scenario, are significantly less than" the regulatory standards.  *Id.* at 6.  Specifically, the tool "model[ed] a 'worst-case' scenario where soil was presumed to contain an activity concentration of 264 pCi/g of plutonium down to a depth of 2 meters"—even though all the follow-up testing indicated activity levels far below the 50 pCi/g remedial standard.  *Id.*  "Even in [that] extremely conservative scenario, calculated radiation doses [were] well below levels that would indicate a need for oversight."  *Id.*

Summarizing these findings, CDPHE explained that "these efforts paint a consistent picture: remaining Rocky Flats plutonium in the Jefferson Parkway transportation corridor and offsite poses a small risk, well within regulatory limits for radiation.  This conclusion is consistent with previous findings and the cleanup process."  ECF No. 11-1 at 7.  FWS explicitly adopted this conclusion when it issued its August 2020 EA for the trail development project.  ECF No. 8-17 at 8.  And based on that EA, FWS issued its FONSI in November of that same year.  *See* ECF No. 8-20.  FHWA issued its own FONSI for the project in August 2023, in which it incorporated FWS's EA and FONSI into its analysis.  *See* ECF No. 8-21.  The agencies then advised the public of these decisions, explaining that any challenge to them would "be barred unless the claim [was] filed on or before January 8, 2024"—the statutory deadline.  *See* Notice of Final Federal Agency Action on the Rocky Flats National Wildlife Refuge Trails and Rocky Mountain Greenway Connections Project in Colorado, 88 Fed. Reg. 54,392 (Aug. 10, 2023).

### C.    Procedural Background

Plaintiffs sued FWS and FHWA on January 8, 2024.[5]  They claimed that the agencies violated NEPA and the Administrative Procedure Act ("APA") by failing to prepare an EIS, failing to consider adequate alternatives to the project, and failing to adequately involve the public.  *See* ECF No. 1 ¶¶ 89–93.  Over three weeks later, they moved for a preliminary injunction.  *See* ECF No. 8.  The Court held a hearing on the motion on March 6, 2024, and the agencies informed the Court that the status quo would not materially change for many months.  More specifically, although FWS had substantially completed its portion of construction work at that point, *see* ECF

---

[5] FWS and FHWA are lodged within the U.S. Departments of the Interior and Transportation, respectively.  Plaintiffs also sued those Departments and their agency heads, Secretary of the Interior Deb Haaland and Secretary of Transportation Pete Buttigieg.  For brevity, the Court will refer only to FWS and FHWA or "the agencies."

No. 11-2 ¶¶ 36–37, FHWA was expected to "break ground in the fall," ECF No. 26 at 45.  FHWA is constructing prefabricated components, which are set to be installed in the fall with a completion date of spring 2025.  *Id.* at 46–47.[6]

## II.   Legal Standard

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).  "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  *Id.* at 20.  The last two factors merge when plaintiffs seek preliminary relief against the government.  *Nken v. Holder*, 556 U.S. 418, 435 (2009).  Before *Winter*, the factors were "evaluated on a 'sliding scale'" such that "an unusually strong showing on one of the factors" could make up for a weaker showing on another.  *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1291–92 (D.C. Cir. 2009) (quoting *Davenport v. Int'l Bhd of Teamsters*, 166 F.3d 356, 361 (D.C. Cir. 1999)).  That said, the D.C. Circuit "has suggested, without deciding, that *Winter* should be read to abandon the sliding-scale analysis in favor of a 'more demanding burden' requiring plaintiffs to

---

[6] Afterward, Plaintiffs moved to advance the trial on the merits and consolidate it with the hearing.  *See* ECF No. 17.  The agencies opposed both motions.  *See* ECF Nos. 11, 22.  Courts have broad discretion to "advance the trial on the merits and consolidate it with [a preliminary-injunction] hearing." Fed. R. Civ. P. 65(a)(2).  They may do so "[b]efore or after" the hearing.  *Id.* Here, FWS and FHWA object to consolidation because of the lack of a certified administrative record.  ECF No. 22 at 3–4.  And "[t]ypically, the [C]ourt is required to provide notice to the parties before consolidating the case on the merits."  *Morris v. District of Columbia*, 38 F. Supp. 3d 57, 62 n.1 (D.D.C. 2014).  This notice requirement is generally meant to "afford the parties a full opportunity to present their respective cases."  *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981) (quoting *Pughsley v. 3750 Lake Shore Drive Cooperative Bldg.*, 463 F.2d 1055, 1057 (7th Cir. 1972)).  Given the agencies' opposition, the potential for prejudice to them in requiring them to proceed without a certified record, and the lack of advance notice, the Court declines to advance the trial on the merits.

independently demonstrate both a likelihood of success on the merits and irreparable harm." *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 205 F. Supp. 3d 4, 26 (D.D.C. 2016) (quoting *Sherley v. Sebelius*, 644 F.3d 388, 392–93 (D.C. Cir. 2011)).  Thus, "without a likelihood of success on the merits, Plaintiffs are not entitled to a preliminary injunction regardless of their showing on the other factors." *Brown v. FEC*, 386 F. Supp. 3d 16, 24 (D.D.C. 2019) (citing *Ark. Dairy Coop. Ass'n, Inc. v. U.S. Dep't of Agric.*, 573 F.3d 815, 832 (D.C. Cir. 2009)).  In addition, showing irreparable harm is a "non-negotiable hurdle" for preliminary-injunctive relief.  *Cal. Ass'n of Private Postsecondary Schs. v. DeVos (CAPPS)*, 344 F. Supp. 3d 158, 167 (D.D.C. 2018). "A movant's failure to show any irreparable harm is therefore grounds for refusing to issue a preliminary injunction, even if the other three factors entering the calculus merit such relief." *Chaplaincy of Full Gospel Churches v. England,* 454 F.3d 290, 297 (D.C. Cir. 2006).  At the preliminary-injunction stage, a plaintiff may rely on "evidence that is less complete than in a trial" but "bears the burden of producing credible evidence sufficient to demonstrate his entitlement to injunctive relief." *CAPPS*, 344 F. Supp. 3d at 166–67 (citations omitted) (cleaned up).

## III.   Analysis

Plaintiffs have not shown that they are likely to succeed on the merits or that they are likely to suffer irreparable harm without relief.  Thus, they are not entitled to a preliminary injunction for both of those independent reasons.

### A.   Plaintiffs are Not Likely to Succeed on the Merits

Plaintiffs bring an APA claim and allege violations of NEPA.[7]  ECF No. 1 ¶¶ 89–93.  Under the APA, courts "set aside any agency action, finding, or conclusion that is 'arbitrary,

---

[7] Because NEPA lacks a private cause of action, "NEPA claims must be brought under the APA." *Karst Env't Educ. & Prot., Inc. v. EPA*, 475 F.3d 1291, 1297 (D.C. Cir. 2007).

capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Theodore Roosevelt Conservation P'ship v. Salazar*, 616 F.3d 497, 507 (D.C. Cir. 2010) (quoting 5 U.S.C. § 706(2)(A)). In applying this standard to Plaintiffs' NEPA challenges, the Court's role is not to "'flyspeck' an agency's environmental analysis, looking for any deficiency no matter how minor." *Nevada v. DOE*, 457 F.3d 78, 93 (D.C. Cir. 2006). "Rather, it is 'simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious.'" *WildEarth Guardians v. Jewell*, 738 F.3d 298, 308 (D.C. Cir. 2013) (quoting *City of Olmsted Falls, Ohio v. FAA*, 292 F.3d 261, 269 (D.C. Cir. 2002)).

Plaintiffs argue that FWS and FHWA violated NEPA—and thus acted arbitrarily and capriciously—in three ways. First, Plaintiffs contend that the agencies should have prepared an EIS for the trail development project. ECF No. 8-1 at 23–29. Second, they claim that the agencies failed to consider a reasonable range of alternatives. *Id.* at 29–34. And third, they argue that the agencies failed to adequately involve the public in the NEPA process. *Id.* at 34–35. They are not likely to succeed on any of these theories.

### 1.      The Agencies Did Not Need to Prepare an EIS

"To issue a FONSI and decline to prepare an EIS, an agency must have concluded that 'there would be no significant impact or have planned measures to mitigate such impacts.'" *Myersville Citizens for a Rural Cmty., Inc. v. FERC*, 783 F.3d 1301, 1322 (D.C. Cir. 2015) (quoting *Mich. Gambling Opposition v. Kempthorne*, 525 F.3d 23, 29 (D.C. Cir. 2008)). Recall that both FWS and FHWA, relying on FWS's EA, determined that the trail development project would have no significant environmental impact and so declined to draft and issue an EIS. *See* ECF Nos. 8-20 (FWS FONSI), 8-21 (FHWA FONSI). Plaintiffs challenge that determination.

The Court's "role in reviewing an agency's decision not to prepare an EIS is a limited one designed primarily to ensure that no arguably significant consequences have been ignored."

*Myersville*, 783 F.3d at 1322 (citation omitted) (cleaned up).  The Court simply asks whether the agency:

> (1) has accurately identified the relevant environmental concern, (2) has taken a hard look at the problem in preparing its EA, (3) is able to make a convincing case for its finding of no significant impact, and (4) has shown that even if there is an impact of true significance, an EIS is unnecessary because changes or safeguards in the project sufficiently reduce the impact to a minimum.

*Mich. Gambling*, 525 F.3d at 29 (quoting *TOMAC v. Norton*, 433 F.3d 852, 861 (D.C. Cir. 2006)).[8]

Plaintiffs are not likely to succeed in showing that the agencies needed to prepare an EIS. First, FWS's EA accurately identified the relevant environmental concern because the EA explicitly discussed potential health effects of residual plutonium radiation on the Refuge.[9]  *See* ECF No. 8-17 at 7–8.  Second, FWS's EA took a sufficiently "hard look" at that problem, first by relying on the previous certification from DOE, EPA, and CDPHE that the Rocky Flats cleanup was complete and that the site was "acceptable for unrestricted use and unlimited exposure." *Id.* at 7; *see also* ECF No. 8-5 at 65.  That alone strongly tilts the scale in the agencies' favor. *See WildEarth Guardians v. FWS*, 784 F.3d 677, 691–92 (10th Cir. 2015) (deferring to FWS's reliance on the 2006 certification that the Refuge was "acceptable for unrestricted use and unlimited exposure").

---

[8] "The D.C. Circuit makes clear that although the phrase 'convincing case' (found in factor three above) has appeared in the caselaw, the scope of review is the usual one for reviewing administrative action—'arbitrary, capricious, or an abuse of discretion.'" *Nat'l Parks Conservation Ass'n v. Semonite*, 311 F. Supp. 3d 350, 361–62 (D.D.C. 2018) (citing *Sierra Club v. Van Antwerp*, 661 F.3d 1147, 1154 (D.C. Cir. 2011)), *rev'd on other grounds*, 916 F.3d 1075 (D.C. Cir. 2019). *Contra* ECF No. 8-1 at 23 (asserting that the "'long-established standard' for reviewing an agency's decision not to prepare an EIS is whether, in its FONSI, the agency has 'ma[d]e a convincing case for its finding' of no significant impact" (quoting *Grand Canyon Tr. v. FAA*, 290 F.3d 339, 341 (D.C. Cir. 2002))).

[9] The Court will focus mainly on FWS's EA in assessing the agencies' NEPA compliance. FWS's FONSI relied on the EA, and FHWA's FONSI relied on both the EA and FWS's FONSI. *See* ECF Nos. 8-20 at 1–2 (discussing the EA); 8-21 at 1 (explaining that FHWA's FONSI is "based on" FWS's EA and FONSI).  The propriety of each agency's action under NEPA therefore rises or falls together here.

Even if reliance on that certification were not enough, FWS's EA discussed confirmatory soil sampling that an independent contractor conducted and studies that offsite partners performed, all of which yielded unremarkable results within regulatory limits.  *See* ECF No. 8-17 at 8.  For purposes of the agencies' "hard look" at the problem, these additional studies "put[] extra icing on a cake already frosted."  *Yates v. United States*, 574 U.S. 528, 557 (2015) (Kagan, J., dissenting).

And the cherry on top: CDPHE conducted its own extensive follow-up testing in the wake of the Bill Ray particle's discovery.  ECF No. 8-17 at 8.  Afterward, it concluded that this discovery did not alter the previous scientific consensus that "Rocky Flats plutonium . . . poses a small risk, well within regulatory limits for radiation."  ECF No. 11-1 at 7.  CDPHE reached this conclusion after learning that even Plaintiffs' own follow-up studies yielded soil sample results "well below the . . . remedial standard."  *See id.* at 5.  And FWS discussed CDPHE's conclusion in its EA.  *See WildEarth Guardians*, 784 F.3d at 692 ("NEPA itself instructs agencies that are deciding whether an impact statement is called for to make use of the 'views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards.'" (quoting 42 U.S.C. § 4332(C)(v))).  Together, these efforts reveal that the agencies' "look" at the issue was not only "hard"—it was rock solid.  And third, the agencies "ma[d]e a convincing case for [their] finding[s] of no significant impact," *Mich. Gambling*, 525 F.3d at 29—a conclusion that flows straightforwardly from the results of the agencies' "hard look" at the problem.[10]

Against that background, Plaintiffs remain unconvinced.  *See* ECF No. 8-1 at 24–25.  They observe that there was no explicit reference to the Bill Ray particle in FWS's EA.  *Id.* at 30.  And

---

[10] The fourth factor asks whether the agency "has shown that even if there is an impact of true significance, an EIS is unnecessary because changes or safeguards in the project sufficiently reduce the impact to a minimum."  *Mich. Gambling*, 525 F.3d at 29 (quoting *TOMAC*, 433 F.3d at 861).  Because this fourth factor applies only "if there is an impact of true significance," and no such impact was present here, it is inapplicable.  *Id.*

so, they fault the agencies for "completely ignor[ing] the major discovery of the Bill Ray particle and the import of this significant discovery on public health and safety." *Id.* at 24. They contend that by failing to explicitly refer to the Bill Ray particle, the agencies did not "*accurately* identify the *relevant* environmental concern" and instead took a "head-in the-sand approach." *Id.* at 25 (quoting *Am. Wild Horse Pres. Campaign v. Vilsack*, 873 F.3d 914, 931 (D.C. Cir. 2017)). They also insist that, far from "tak[ing] a 'hard look' at the consequences of the [action]," the agencies "averted [their] eyes altogether." *Id.*

These objections are exaggerated. Plaintiffs essentially say that the agencies defined the "relevant environmental concern" at too high a level of generality. On Plaintiffs' view, rather than discuss the possible health effects from residual radiation generally, the agencies had to specifically analyze the implications of a single soil sample: the Bill Ray particle. But that analysis was unnecessary because CDPHE had already done it, *see* ECF No. 11-1 at 7, and FWS relied on that analysis in its EA, *see* ECF No. 8-17 at 8. CDPHE's follow-up sampling, performed in the area where the Bill Ray particle was discovered, yielded an average result of 0.925 pCi/g, with the highest results being less than 3 pCi/g. ECF No. 11-1 at 11. Those results are far below "the 50 pCi/g . . . historical cleanup action level." *Id.* at 5. Moreover, out of an abundance of caution, CDPHE "model[ed] a 'worst-case' scenario where soil was presumed to contain an activity concentration of 264 pCi/g of plutonium down to a depth of 2 meters." *Id.* at 6. Even then, the hypothetical resulting radiation doses would not present "an undue hazard to public health from a radiologic hazard perspective." *Id.*

In this overwhelmingly uncontroversial context, forbidding FWS's EA from relying on CDPHE's conclusion and instead requiring a separate assessment would amount to the "fly-speck[ing]" that is inappropriate in these kinds of cases. *See Sierra Club v. FERC*, 827 F.3d 36,

46 (D.C. Cir. 2016).  Such reliance does not, as Plaintiffs contend, "improperly delegate[] th[e agencies'] statutory duties."  ECF No. 14 at 11.  To the contrary, "[f]ederal agencies may rely on analyses conducted by state and local governments instead of devoting resources to replicating them."  *Red Lake Band of Chippewa Indians v. U.S. Army Corps of Eng'rs*, 636 F. Supp. 3d 33, 56 (D.D.C. 2022) (citation omitted).  And Plaintiffs identify no reason to bar agencies from "reviewing and relying on information, data, and conclusions supplied by other federal *or state* agencies" when assessing the need for an EIS.  *Id.* (citation omitted) (holding that it was appropriate for the federal agency "to evaluate and incorporate the State EIS into its findings, without needing to repeat the state's analysis or discussion").  Here, FWS's EA highlighted the "confirmatory soil sampling" that the agency's contractor had performed, "[a]dditional sampling" completed "off-refuge by partners," and the 2020 CDPHE report describing "soil sampling efforts."  ECF No. 8-17 at 8.  This latter report squarely addressed the Bill Ray particle, and the EA reasonably incorporated those findings and the underlying studies.

Plaintiffs then argue that FWS and FHWA failed to adequately consider NEPA's "significance" factors.  Recall that "[e]nvironmental significance is a function of a proposed agency action's 'context and intensity.'"  *WildEarth Guardians v. Zinke*, 368 F. Supp. 3d 41, 80 (D.D.C. 2019) (quoting 40 C.F.R. § 1508.27).  Within that analysis, agencies assess various "significance factors."  *See* 40 C.F.R. § 1508.27(b) (providing a ten-factor list).  "Implicating any one of [those] factors may be sufficient to require development of an EIS."  *Nat'l Parks Conservation Ass'n. v. Semonite*, 916 F.3d 1075, 1082 (D.C. Cir. 2019).  Plaintiffs argue that the trail development project implicates three such factors, *see* ECF No 8-1 at 25–29:

(1) The degree to which the proposed action affects public health and safety.  40 C.F.R. § 1508.27(b)(2).
(2) The degree to which the effects on the quality of the human environment are likely to be highly controversial.  *Id.* § 1508.27(b)(4).

(3) The degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks.  *Id.* § 1508.27(b)(5).

Further consideration of the "public health and safety" factor is unnecessary because that factor was not implicated for the reason just discussed— the universal chorus of agency determinations that the Refuge is "acceptable for unrestricted use and unlimited exposure."  *See, e.g.*, ECF No. 8-17 at 7.  The Court thus focuses on the latter two factors and takes them in turn.

Plaintiffs contend that the discovery of the Bill Ray particle rendered the trail development project "highly controversial."  ECF No. 8-1 at 26–27.  A proposed action "is highly controversial only if there is, at minimum, 'a substantial dispute . . . as to the size, nature, or effect of the major federal action.'"  *Zinke*, 368 F. Supp. 3d at 81 (quoting *Town of Cave Creek, Arizona v. FAA*, 325 F.3d 320, 331 (D.C. Cir. 2003)).  Further, "[c]ourts in this jurisdiction suggest that . . . there must be 'scientific or other evidence that reveals flaws in the methods or data relied upon by the agency in reaching its conclusions.'"  *Id.* (quoting *Nat'l Parks Conservation Ass'n v. United States*, 177 F. Supp. 3d 1, 33 (D.D.C. 2016)) (collecting cases).  In other words, because "[c]ontroversy . . . is not measured merely by the intensity of opposition," *id.*, "'*something more* is required' for a highly controversial finding 'besides the fact that some people may be highly agitated and be willing to go to court over the matter,'" *Semonite*, 916 F.3d at 1083 (quoting *Fund for Animals v. Frizzel*, 530 F.2d 982, 988 n.15 (D.C. Cir. 1975) (per curiam)).

Plaintiffs have not shown a likelihood that the trail development project is controversial— much less *highly* so—largely because the Bill Ray particle (and radiation at the Refuge more broadly) was studied extensively by various entities and determined not to pose a serious threat to public health.  Plaintiffs insist that "independent nuclear experts (such as Dr. Ketterer) have long objected to placing a trail through the Refuge."  ECF No. 8-1 at 27.  And they claim that "various municipalities have either withdrawn their participation from the Greenway Project altogether . . .

or voiced vigorous support for locating the trail outside the Refuge." *Id.*  Although this might paint a picture of "passionate opposition" to the project, Plaintiffs have failed to establish "the requisite 'something more'" needed to challenge the NEPA process. *Semonite*, 916 F.3d at 1083. Specifically, Plaintiffs have not "cast substantial doubt on the adequacy of the agency's method- ology and data." *Biodiversity Conservation All. v. U.S. Forest Serv.*, 765 F.3d 1264, 1275 (10th Cir. 2014).  For example, Dr. Ketterer's own soil sampling conducted after the Bill Ray particle's discovery yielded results "well below" the remedial standard.  ECF No. 11-1 at 5.  As for the cited municipal decisions, two long preceded the confirmatory studies conducted by FWS's independent contractor and CDPHE.  *See* ECF No. 8-11 (Boulder City Council's 2016 resolution conditioning funding on completion of the NEPA process); ECF No. 8-1 at 19 (describing Town of Superior's 2016 rejection of the trail development project).  And the third—like the two before it—did noth- ing to question the science on which FWS's EA relied.  *See* ECF No. 8-16 (Broomfield resolution). On top of all that, Plaintiffs have not persuasively challenged CDPHE's radiation dose assessment that modeled a worst-case scenario under which there *still* would not be an undue risk to public health.  *See* ECF No. 11-1 at 5–6.  In short, although Plaintiffs "disagree[] [with] the conclusions that should be drawn from" the various studies, they have not "identified any scientific criticism of the methods or data relied upon by" the agencies. *Nat'l Parks Conservation Ass'n*, 177 F. Supp. 3d at 34; *see also Cave Creek*, 325 F.3d at 332 (no controversy where the petitioners "pointed to nothing casting serious doubt on [the agency's] preferred model").

Plaintiffs also argue that the impacts of the trail development project are "highly uncertain or involve unique or unknown risks."  ECF No. 8-1 at 28–29.  Courts have found that this signifi- cance factor is "implicated when an action involves new science, or when an action's impact on a species is unknown." *Zinke*, 368 F. Supp. 3d at 82; *see also, e.g., Found. on Econ. Trends v.*

*Heckler*, 756 F.2d 143, 153 (D.C. Cir. 1985) (holding that the impact of dispersing genetically altered organisms was highly uncertain); *Humane Soc'y of U.S. v. U.S. Dep't of Comm.*, 432 F. Supp. 2d 4, 8–9, 20–21 (D.D.C. 2006) (holding that the impact of first-ever "harassing" studies of endangered sea lion populations was highly uncertain); *Anderson v. Evans*, 371 F.3d 475, 492 (9th Cir. 2004) (holding that the impact of first-ever whale hunt on local whale population and ecosystem was highly uncertain).

Plaintiffs have not shown a likelihood that such circumstances are present here.  Relying on a previous NEPA case involving the Refuge, Plaintiffs note that because "there is an 'increased cancer risk' for 'Refuge workers' and 'Refuge visitors,' . . . we do not know how many workers and visitors will die unnecessarily from this exposure."  ECF No. 8-1 at 28 (quoting *Rocky Mountain Peace & Just. Ctr.*, 40 F.4th at 1145).  But the very case on which Plaintiffs rely reveals that their foreboding references to "increased cancer risks" are acontextual and exaggerated.  That case explained that, at 50 pCi/g, a Refuge worker "would have an increased cancer risk of around 1 in 133,000."  *Rocky Mountain Peace & Just. Ctr.*, 40 F.4th at 1145.  For a Refuge visitor, that rate "would be around 1 in 227,000."  *Id.*  And those calculations assumed substantial time spent in the area; a "Refuge worker," for example, was defined as an "individual[] who worked four hours indoors and four hours outdoors in the area for 250 days each year for 18.7 years."  *Id.* at 1145 n.8.  These breathtakingly small rates suggest that the health risks associated with the Refuge are exceptionally low—not that they are highly uncertain or unknown.

Plaintiffs also say that "[i]n the absence of enhanced sampling and studies in the wake of the Bill Ray particle discovery, there is significant uncertainty as to how many particles in the action area exceed regulatory limits and the cancer, health, and safety threats those particles pose."  ECF No. 8-1 at 28.  But this argument overlooks the "enhanced sampling and stud[y]" by CDPHE,

which concluded that "remaining Rocky Flats plutonium in the Jefferson Parkway transportation corridor and offsite poses a small risk, well within regulatory limits for radiation." ECF No. 11-1 at 7. Indeed, the Bill Ray particle was reasonably found to be an anomaly—a finding bolstered by Plaintiffs' own soil sampling that yielded results "well below the 50 pCi/g . . . remedial standard." *Id.* at 5. Given these conclusions from the scientific tests FWS's EA relied on, Plaintiffs have not shown a likelihood that the trail development project's impacts are highly uncertain or unknown.

For all these reasons, Plaintiffs have not shown a likelihood of success on their claim that the agencies needed to draft an EIS for the trail development project.

### 2.      The Agencies Considered a Reasonable Range of Alternatives

Plaintiffs next argue that the agencies violated NEPA by failing to consider a reasonable range of alternatives. *See* ECF No. 8-1 at 29–34. An EA must include a "brief discussion[]" of reasonable alternatives to the proposed action. 40 C.F.R. § 1508.9(b). "An EA's consideration of 'reasonable alternatives' need not be 'as rigorous as the consideration of alternatives in an EIS.'" *Chippewa Indians*, 636 F. Supp. 3d at 61 (quoting *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 255 F. Supp. 3d 101, 134 (D.D.C. 2017)). The relevant regulations make this clear. *Compare* 40 C.F.R. § 1508.9(b) (requiring "brief discussion[]" of reasonable alternatives in an EA), *with id.* § 1502.14(a) (requiring EIS to "[r]igorously explore and objectively evaluate *all* reasonable alternatives" (emphasis added)). Caselaw emphasizes this point as well. *See, e.g.*, *Env't Prot. Info. Ctr. v. U.S. Forest Serv.*, 451 F.3d 1005, 1016 (9th Cir. 2006) ("[A]n agency's obligation to consider alternatives under an EA is a lesser one than under an EIS." (citation omitted)); *La. Crawfish Producers Ass'n-W. v. Rowan*, 463 F.3d 352, 357 (5th Cir. 2006) ("[T]he range of alternatives that the [agency] must consider decreases as the environmental impact of the proposed action becomes less and less substantial." (citation omitted)).

"An alternative is reasonable if it is objectively feasible as well as reasonable in light of the agency's objectives." *Myersville*, 783 F.3d at 1323 (citation omitted) (cleaned up). "The agency 'bears the responsibility for deciding which alternatives to consider' and need only follow a 'rule of reason,' which governs 'both *which* alternatives the agency must discuss, and the *extent* to which it must discuss them.'" *Chippewa Indians*, 636 F. Supp. 3d at 61 (quoting *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 195 (D.C. Cir. 1991)). The agency's "specification of the range of reasonable alternatives is entitled to deference." *Myersville*, 783 F.3d at 1323.

Plaintiffs have not shown that it is likely that the agencies failed to consider reasonable alternatives. FWS's EA evaluated a "no-action alternative" and an "open space alternative (proposed action)." ECF No. 8-17 at 9. The "no-action alternative" essentially meant that the status quo would remain unaltered. *See id.* at 9–10. And the proposed action would involve "construct[ing] new portions and improv[ing] existing trail segments," as well as constructing "a trail bridge . . . and an underpass . . . to provide trail users a continuous trail connection to existing regional trail networks." *Id.* at 10. FWS's EA also explained why it would not evaluate certain other alternatives. *Id.* at 11. For example, the EA excluded off-Refuge alternatives because they were not "within the scope of the Federal Lands Access Program" ("FLAP"), *see id.* at 11, a program through which the project is funded and that applies only to federal lands, *see* 23 U.S.C. § 204; ECF No. 11-2 ¶ 14. Thus, FWS's EA reasonably concluded that off-Refuge alternatives were not "objectively feasible" or reasonable "in light of [the agency's] objectives." *Myersville*, 783 F.3d at 1323.

Plaintiffs' objections to that range of alternatives do not move the needle. First, they disagree with the refusal to consider off-Refuge options. ECF No. 14 at 17. They say that confining the consideration of alternatives based on the availability of FLAP funding is "foreclose[d]" by

NEPA's regulations.  *Id.* at 16.  Plaintiffs are mistaken.  They cite 40 C.F.R. § 1502.14(c), which states that "agencies shall . . . [i]nclude reasonable alternatives not within the jurisdiction of the lead agency."  But that regulation applies to EISs, not to EAs.  *See id.* § 1502.14 ("This section is the heart of the *environmental impact statement*." (emphasis added)).  Plaintiffs then point to a Ninth Circuit case that expressed concern about limiting alternatives based on "the availability of funding sources."  *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 814 (9th Cir. 1999).  But that case, too, addressed an EIS.  *See id.*  As discussed above, an EA's consideration of reasonable alternatives "need not be as rigorous as the consideration of alternatives in an EIS." *Myersville,* 783 F.3d at 1323.  That is doubly true here, where the effects of the trail development project were found to be minimal.  *See Rowan*, 463 F.3d at 357 ("[T]he range of alternatives that the [agency] must consider decreases as the environmental impact of the proposed action becomes less and less substantial." (citation omitted)).  So the Court sees no reason to call into question the EA's reliance on the FLAP framework when it specified the range of alternatives that were feasible.

Second, Plaintiffs fault the agencies for failing to consider an on-Refuge alternative that avoids "the most heavily contaminated Wind Blown Area."  ECF No. 14 at 20.  But this argument fails because of the scientific analysis undergirding FWS's EA.  Specifically, the scientific consensus since the 2006 CAD/ROD has been that the *entire* Refuge—including the Wind Blown Area—is "acceptable for unrestricted use and unlimited exposure."  ECF No. 8-5 at 65.[11]  That conclusion remained undisturbed by the confirmatory soil sampling conducted before FWS issued

---

[11] *See also Rocky Mountain Peace & Just. Ctr.*, 40 F.4th at 1158 ("[Plaintiff] argues [FWS] has previously acknowledged that different parts of the Refuge have varying levels of plutonium radiation. . . .  This argument fails.  The 2004 CCP/EIS considered the varying plutonium levels across the Refuge and determined that the Refuge was generally safe for public use.").

its EA.  *See* ECF No. 8-17 at 8 ("The maximum plutonium . . . activity detected was 3.510 pCi/g

within the Wind Blown Exposure Unit, which is one-third the Wildlife Refuge Worker PRG of 9.3

pCi/g.").  The discovery of the Bill Ray particle, moreover, did not alter that scientific judgment.

Subsequent testing confirmed that it was an anomaly, and a single, anomalous testing event cannot

upend all the other scientific data.  *See generally* ECF No. 11-1; *see also New Mexico ex rel.

Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 705 (10th Cir. 2009) ("When the relevant

environmental impacts have already been considered earlier in the NEPA process, no supplement

is required." (cleaned up) (citation omitted)).  Thus, the record provides no reason to doubt the

agencies' conclusion that "every alternative in the Refuge shares the same level of radiation health

risk: none."  ECF No. 11 at 21.  And requiring the agencies to consider every permutation of trails

within the Refuge would result in a nearly infinite number of alternatives, frustrating the require-

ment that EAs remain "concise" and "brief."[12]  40 C.F.R. § 1508.9.

---

[12] Plaintiffs also fault the agencies for failing to consider a "true" no action alternative.  *See* ECF No. 14 at 17–18.  As a preliminary matter, it is not clear from the cited regulation and regulatory guidance that this consideration is required for an EA as opposed to an EIS.  The relevant regulation, § 1502.14, "governs the EIS" and "does not apply" to the "preliminary EA document." *W. Watersheds Project v. Bureau of Land Mgmt.*, 721 F.3d 1264, 1274 (10th Cir. 2013); *but see* ECF No. 14 at 17 (citing § 1502.14, which states that the alternatives section "is the heart of the *environmental impact statement* (emphasis added)); *id.* at 17 n.3 (citing Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations, 46 Fed. Reg. 18,026, 18,027 (Mar. 23, 1981), which states that "[§] 1502.14(d) requires the alternative analysis in the *EIS* to 'include the alternative of no action,'" and that the comparisons would occur "in the *EIS*" (emphases added)).  In any event, Plaintiffs appear to contend that the agencies needed to consider a "true no-action alternative," ECF No. 14 at 17, which the Court understands to mean a rolling back of the "Comprehensive Conservation Plan" that has "governed" "[m]anagement of the refuge" since 2005, ECF No. 8-17 at 9.  But the relied-on regulatory guidance explains that when a land-management plan is in place, "'no action' is 'no change' from the current management direction or level of management intensity."  Forty Most Asked Questions, 46 Fed. Reg. at 18,027. After all, "construct[ing] an alternative that is based on no management at all would be a useless academic exercise."  *Id.*  Because "CEQ regulations allow the status quo to properly be the no action alternative," *Ass'n of Pub. Agency Customers, Inc. v. Bonneville Power Admin.*, 126 F.3d 1158, 1188 (9th Cir. 1997), the agencies' assessment of the "No Change(s) From Existing Plan"

For all these reasons, Plaintiffs have not shown a likelihood that the specification of alternatives in FWS's EA was unreasonable.

### 3.   The Agencies Adequately Involved the Public in the NEPA Process

Plaintiffs' last argument is that the agencies inadequately involved the public in the NEPA process in two ways: (1) by circulating FWS's draft EA for only 14 instead of 30 days, and (2) by failing to publish notice of the EA in a newspaper of record.  ECF No. 8-1 at 34–35.  Plaintiffs have not shown that they are likely to succeed on either of these theories, either.

As a general matter, "neither [NEPA] nor [its] regulations prescribe any length or scope of public comment on a draft environmental assessment." *Fund for Animals v. Norton*, 281 F. Supp. 2d 209, 226 (D.D.C. 2003).  Instead, a 30-day public-comment period is necessary only "[i]n certain limited circumstances" before an agency issues a FONSI.  40 C.F.R. § 1501.4(e)(2).  Those circumstances include if "[t]he proposed action is, or is closely similar to, one which normally requires the preparation of an [EIS]," or "[t]he nature of the proposed action is one without precedent."[13]  *Id.*  "[T]he agency has significant discretion in determining when public comment is required with respect to EAs."  *TOMAC*, 433 F.3d at 861.

---

alternative satisfies their obligations, ECF No. 8-17 at 9.  That is especially so "[g]iven the different standards for an EIS and an EA"; as explained, the former requires "[r]igorous explor[ation]" of reasonable alternatives, while the latter is a "concise public document" focused on the potential need for an EIS. *W. Watersheds Project*, 721 F.3d at 1274 (citation omitted).  Although the Plaintiffs may disagree with the existing land-management plan, "[t]he requirement to consider a no-action alternative does not provide [Plaintiffs] a vehicle in which to pursue allegations that past . . . actions received insufficient environmental analysis.  The time has passed to challenge past actions."  *Custer Cnty. Action Ass'n v. Garvey*, 256 F.3d 1024, 1040 (10th Cir. 2001).

[13] Plaintiffs point to nonbinding guidance from the Council on Environmental Quality that elaborated on these two limited circumstances.  ECF No. 8-1 at 28.  That guidance says:

Public review is necessary, for example, (a) if the proposal is a borderline case, i.e., when there is a reasonable argument for preparation of an EIS; (b) if it is an unusual case, a new kind of action, or a precedent setting case such as a first intrusion of

Plaintiffs have not shown a likelihood that either "limited circumstance" applied, so there was no need for a 30-day public comment period.  For the same reasons that an EIS was not required, the trail development project is not—and is not similar to—a proposed action that normally requires preparing an EIS.  Additionally, the nature of the trail development project is not without precedent.  The scope of the project is narrow; it adds only "2.7 miles of new trail" to a Refuge that already has 5.5 miles of trail, ECF No. 11-2 ¶ 15, and installs "three prefabricated pedestrian bridges," ECF No. 11-3 ¶ 8.  Moreover, existing trails on the Refuge have been open to the public for years and receive "thousands of visitors."  ECF No. 11-2 ¶¶ 7–8.  So Plaintiffs are incorrect when they argue that this is "a new kind of action" because it "would be the first-ever public Greenway trail through the Refuge" and would "draw[] in tens of thousands of unsuspecting visitors each year."  ECF No. 8-1 at 35.  Thus, they have not shown a likelihood that anything more than the 14-day comment period was required.[14]

---

even a minor development into a pristine area; (c) when there is either scientific or public controversy over the proposal; or (d) when it involves a proposal which is or is closely similar to one which normally requires preparation of an EIS.  Sections 1501.4(e)(2), 1508.27.  Agencies also must allow a period of public review of the FONSI if the proposed action would be located in a floodplain or wetland.

Forty Most Asked Questions, 46 Fed. Reg. at 18,037.  None of these factors move the needle, however, because they are largely coterminous either with the text of the regulation itself, see 40 C.F.R. § 1501.4(e)(2), or with the "significance" factors discussed above that are considered in deciding whether to draft an EIS.

[14] The Court is also unpersuaded by Plaintiffs' reliance on *Fund for Animals v. Norton*, 281 F. Supp. 2d 209 (D.D.C. 2003), see ECF No. 8-1 at 35, which rejected a two-week comment period.  *See Norton*, 281 F. Supp. 2d at 226–29.  But that case involved "manifest public interest" in the project at issue.  *Id.* at 226 n.11.  There, even "members of Congress [had] asked for more time" to engage in public comment.  *Id.*  Plaintiffs have not shown a similar level of public interest here.  And, in any event, they simply have not pointed to anything suggesting a 14-day comment period is per se insufficient under NEPA.

Plaintiffs have also failed to show a likelihood of success on their claim that FWS violated NEPA by failing to publish notice of FWS's EA in a newspaper of record. *See* ECF No. 8-1 at 35. The regulation governing public notice says that "[a]gencies shall . . . [p]rovide public notice of NEPA-related hearings, public meetings, and the availability of environmental documents so as to inform those persons and agencies who may be interested or affected." 40 C.F.R. § 1506.6(b). It does not specify *how* that notice is to be given. Thus, Plaintiffs have not shown that FWS violated that regulation when it released its draft EA for public review and notified the public through a press release posted on the Refuge's website. *See* ECF No. 8-20 at 1. That is so despite their insistence that notice "in a newspaper of record [was] required by 40 C.F.R. § 1506.6(b)(3)." ECF No. 8-1 at 35. The cited subsection, though, imposes no binding obligation; it merely provides a suggestive list of possibly appropriate means for issuing notice. *See* 40 C.F.R. § 1506.6(b)(3) ("In the case of an action with effects primarily of local concern the notice *may* include . . . ." (emphasis added)). And as a practical matter, it seems evident that the notice here was effective, "as FWS received a total of 124 responses—including comments from some of the plaintiffs." ECF No. 11 at 23.

For these reasons, Plaintiffs have not shown a likelihood of success on their claim that the public was inadequately involved in the NEPA process.

### B.     Plaintiffs Have Not Shown They Are Likely to Suffer Irreparable Harm Absent a Preliminary Injunction

Because Plaintiffs' failure to show a likelihood of success on the merits is dispositive, the Court need not address any other preliminary-injunction factors. Still, the Court notes that Plaintiffs have not shown irreparable harm, which is another independent reason why their motion fails.

"The standard for irreparable harm is particularly high in the D.C. Circuit." *Fisheries Survival Fund v. Jewell*, 236 F. Supp. 3d 332, 336 (D.D.C. 2017). To satisfy this "high standard," the

alleged injury "must be both certain and great," "of such imminence that there is a clear and present

need for equitable belief," and "beyond remediation." *Chaplaincy*, 454 F.3d at 297 (internal quo-

tation marks and citation omitted).

Plaintiffs argue that without an injunction, there is a risk that their members may eventually

develop illness or die because they could be exposed to any plutonium particles that may be dis-

turbed by the trail development project and picked up by the wind.  But when, as here, a theory of

irreparable harm relies on a causal chain, a plaintiff must show that each of the "chain's individual

components—let alone the feared end result—is" not merely "possibl[e]," but "*likely*." *Standing*

*Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 540 F. Supp. 3d 45, 57 (D.D.C. 2021) (quoting

*Winter*, 555 U.S. at 22) (alterations in original).  Plaintiffs' chain is long.  They must establish a

likelihood that (1) the Refuge's soil contains unsafe levels of plutonium, (2) the construction will

disturb the plutonium, (3) Plaintiffs will be exposed to the disturbed plutonium, and (4) an irrepa-

rable injury would result from that exposure.  But as the agencies explain, Plaintiffs heap specula-

tion upon speculation rather than prove the likelihood that each link in the chain will occur.  *See*

ECF No. 11 at 17–23.  They do not come close to establishing irreparable harm on this theory.

Plaintiffs' evidence of the last component of the chain—that exposure would lead to

harm—is illustrative.  Even putting aside Dr. Nichols' lack of expert credentials in this area, his

opinion that exposure to "a single particle of plutonium *could* initiate cancer" hardly shows that

someone is *likely* to develop cancer from that level of plutonium exposure.  ECF No. 8-8 at 2

(emphasis added).  On top of that, he concedes that "it is impossible to determine" who—specifi-

cally—may develop cancer, so he cannot say that any of Plaintiffs' members are likely to do so if

the trail development project proceeds.  *See id.*  So Plaintiffs "never actually point to evidence

suggesting that such an incident"—the development of cancer or another illness as a result of

plutonium exposure on the Reserve if the project proceeds—"*is* likely." *Standing Rock*, 540 F.

Supp. 3d at 58.  They also "fail to engage with [the agencies'] evidence that," all things considered,

such a result is quite "*un*likely." *Id.*  For example, a radiation level of 50 pCi/g translates to "an

increased cancer risk" for "Refuge workers"—*i.e.*, those with far greater exposure[15] than that as-

serted by any Plaintiff—of about "1 in 133,000." *Rocky Mountain Peace & Justice Ctr.*, 40 F.4th

at 1145.  And as mentioned, testing demonstrated that the Bill Ray particle was an anomaly and

that pCi/g levels in the Refuge were far lower than 50pCi/g.  *See e.g.*, ECF No. 11-1 at 7 ("[T]hese

efforts paint a consistent picture: remaining Rocky Flats plutonium in the Jefferson Parkway trans-

portation corridor and offsite poses a small risk, well within regulatory limits for radiation."); *id.*

at 11 ("step-out sampling" after discovery of Bill Ray particle revealed average pCi/G of under 1

pCi/g, with no sample exceeding 3 pCi/g); ECF No. 8-17 at 8 ("The maximum plutonium . . .

activity detected was 3.510 pCi/g within the Wind Blown Exposure Unit . . . .").  Cancer, of course,

is a devastating harm.  But Plaintiffs have not shown that the trail development project poses an

increased risk of cancer to them that is certain, great, and imminent such that it meets the standard

for irreparable harm.

Finally, the hodgepodge of other asserted harms that Plaintiffs make a halfhearted effort to

defend as irreparable harm do not qualify as such, either.  The Court cannot discern how the con-

struction would concretely and irreparably injure Mr. Lipsky's professional reputation, anyone's

enjoyment of the aesthetic and recreational opportunities in or around the Refuge, or Plaintiffs'

---

[15] Plaintiffs' failure to show that another important link in the chain is likely—that the trail development project will increase their exposure to plutonium in the first place—warrants highlighting as well.  *See, e.g.*, *Cuomo v. United States Nuclear Regul. Comm'n*, 772 F.2d 972, 976 (D.C. Cir. 1985) (finding that even though there was "inevitably some extremely small possibility that radiation could be released into the surrounding environment as a consequence of [a low-power test of a nuclear power plant] . . . [that] likelihood of occurrence is too small to meet an irreparable harm standard").

ability to educate the public about any topic—at least not as a "direct[] result" of "the action which the movant[s] seek[] to enjoin." *Wisc. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985).

## IV.     Conclusion

For all the above reasons, Plaintiffs' Motion to Consolidate Under Federal Rule of Civil Procedure 65(a)(2) and their Motion for a Preliminary Injunction will be denied.  A separate order will issue.

/s/ Timothy J. Kelly           
TIMOTHY J. KELLY
United States District Judge

Date: September 8, 2024